UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RICHARD E. STONE,

                              Plaintiff,

                                                          OPINION AND ORDER

         -against-
                                                          04 CV 4141 (NG) (LB)

MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY,

                              Defendant.
------------------------------------------------------------X

**GERSHON, United States District Judge:**

         *Pro se* plaintiff Richard E. Stone is a former employee of defendant, Manhattan and Bronx

Surface Transit Operating Authority ("MaBSTOA"), who brings this action alleging disability

discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§

12101 *et seq.*[1]  On February 10, 2005, plaintiff filed a "Charge of Discrimination" with the EEOC,

alleging that he was constructively discharged on the basis of a disability.  On June 23, 2004, the

EEOC found that "the evidence is insufficient to conclude [the employer] discriminated against

---

[1]  Plaintiff commenced this action on September 22, 2004 against the U.S. Equal
Employment Opportunity Commission ("EEOC") and the New York City Transit Authority
("NYCTA").  On March 29, 2005, defendant EEOC moved to dismiss the claims against it, and
on July 7, 2005, the court granted the unopposed motion on the grounds that the court lacked
subject matter jurisdiction over claims against a federal agency and that plaintiff failed to state a
claim against the defendant since Title VII provides no cause of action for the EEOC's failure to
investigate or process an employment discrimination charge.
         Defendant NYCTA answered the Complaint on November 17, 2005, but specifically
noted therein that plaintiff was not an employee of NYCTA, but of MaBSTOA, a legally distinct
public benefit corporation that can sue or be sued in its own name, as per New York Public
Authorities Law §§ 1203-a(3), 1204(1).  On March 8, 2006, Magistrate Judge Bloom granted
plaintiff's oral motion to amend the complaint to dismiss the NYCTA as a defendant and name
MaBSTOA as the proper defendant.  The court also ordered that NYCTA's Answer was
"deemed amended to respond on behalf of MaBSTOA in precisely the same manner as NYCTA
previously responded."

[plaintiff]" and that it was unlikely additional investigation would result in a different finding than that plaintiff was terminated for attendance and punctuality issues. The EEOC issued a "Notice of Right to Sue" and this action ensued. Defendant now moves for summary judgment to dismiss the complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff did not respond to defendant's motion despite defendant's notice to plaintiff pursuant to Local Civil Rule 56.2 that "the claims you assert in your complaint may be dismissed without a trial if you do not respond to this motion by filing your own sworn affidavits or other papers as required by Rule 56(e)." The motion is therefore unopposed.[2]

## FACTS

Unless otherwise indicated, the following facts are undisputed. On July 3, 2003, MaBSTOA processed plaintiff for part-time employment as a traffic checker in its Operations Planning Department. The same day, plaintiff signed MaBSTOA's "Terms and Conditions of Certification and Appointment" document, which provided in part that the appointment would be "on a probationary basis for six months" and was subject to "satisfactory completion of the training period." Plaintiff also signed New York City Transit's "New Employee Information Package"

---

[2] From the time defendant informed the court, by letter dated February 5, 2007, of its intent to move for summary judgment, defendant has been unable to contact or send correspondence to plaintiff. On February 27, 2007, defendant informed the court of the issue and requested that the court dismiss this action. The court denied that request and directed defendant to make its motion to dismiss by March 12, 2007. Defendant filed its motion that day and also served plaintiff with all of its summary judgment papers via first-class mail to plaintiff's address of record in the court's docket. On or about March 22, 2007, the envelope containing all of the motion papers was returned unopened to defendant and stamped "Refused: RTS [Return to Sender]" by the United States Postal Service. On March 27, 2007, defendant re-filed its motion to dismiss along with a letter informing the court that the motion papers could not be served on plaintiff and requested that the court dismiss the action for plaintiff's failure to prosecute under Federal Rule of Civil Procedure 41(b), or alternatively, to deem the motion for summary judgment as fully submitted. In an Order dated May 11, 2007, Magistrate Judge Bloom denied defendant's motion to dismiss but granted its request to consider the motion unopposed.

document and thereby acknowledged receipt of various employment policy booklets and pamphlets. Among the items received was a handbook entitled, "Rules & Regulations Governing Employees Engaged in the Operation of the MTA New York City Transit System" ("Rules Handbook"), which required its employees, including all MaBSTOA employees, to be familiar with and to obey all rules provided therein. The Rules Handbook specifically provided that employees who report late for duty will be penalized and that employees who anticipate being absent from work must provide "proper notice in person or by telephone to their assignment desks or control offices . . . , at least one hour before their scheduled reporting time . . . , unless a leave of absence has been previously authorized." Dfs. Exh. L at 3.

Plaintiff commenced employment on July 7, 2003 with a four-week long training program during which all probationary traffic checkers reported to different MaBSTOA work locations to complete various assignments in groups. On the first day of orientation, plaintiff received a schedule listing all of the times and locations of work for each day of the entire training period. Plaintiff also received from a "Traffic Checking Operations Section 3: Job Rules and Requirements" ("Section 3 Rules") document, which provided that traffic checkers "are required to report to [their] assignment on time and ready to work" and "<u>must</u> notify the Communication Desk" in case of emergency, tardiness, or absence." Dfs. Exh. M. The Section 3 Rules further provided that "[a]ppropriate disciplinary action will be taken in all instances where Authority rules including instructions in this manual have been violated." *Id.*

During the four-week training period, plaintiff was served with a "Discrepancy Notification" for unauthorized tardiness on three separate occasions. First, on July 15, 2003, the supervisor on duty cited plaintiff for arriving 18 minutes late for his 5:00 A.M. assignment at the Castleton Bus Depot due to his failure to "allow[] himself enough time to travel." Dfs. Exh. N. Plaintiff was

notified regarding his lateness and, on July 16, 2003, MaBSTOA initiated a disciplinary hearing during which plaintiff was represented by Anita Goodman of the Transport Workers Union, Local 100 ("TWU"), the labor organization representing traffic checkers for collective bargaining purposes as well as for processing and settling disciplinary disputes.  The matter was resolved by counseling, rather than dismissing, plaintiff for lateness, and he and Ms. Goodman signed the Discrepancy Notification to acknowledge that he had been counseled.  The General Superintendent of Traffic Checking Operations, Gregory Miller, also signed the Discrepancy Notification, and marked that plaintiff's lateness was not excused by management and that there was no acceptable documentation provided.

Second, on July 17, 2003, a day after being counseled about his first lateness, the supervisor on duty cited plaintiff for arriving 10 minutes late for his 6:00 A.M. assignment at 145th Street and St. Nicholas Avenue in Manhattan, again due to his failure to give himself sufficient time to get to work.  Plaintiff was notified, and defendant initiated disciplinary action.  During the disciplinary hearing held on July 22, 2003, plaintiff was counseled once again regarding his lateness, and both he and Ms. Goodman signed the Discrepancy Notification in acknowledgment. Mr. Miller also signed the Discrepancy Notification and noted that the lateness was not excused by management and that there was no acceptable documentation provided.

Third, on July 24, 2003, the supervisor on duty cited plaintiff for arriving 3 minutes late for his 6:00 A.M. assignment at East 68th Street and Second Avenue in Manhattan due to commuting delays caused by a flat tire on plaintiff's bicycle.  Plaintiff was notified regarding his lateness, and defendant initiated another disciplinary hearing on the same day.  Plaintiff was counseled to improve

his attendance and he, along with Ms. Goodman, signed the Discrepancy Notification.[3] Mr. Miller also signed the form, and noted that the lateness was not excused by management and that there were no acceptable documents provided.

After plaintiff concluded training, though while he was still a probationary employee, plaintiff received two other Disciplinary Notifications for tardiness and an absence without leave ("AWOL") on August 10, 2008 and August 23, 2008, respectively. Plaintiff, like all traffic checkers, was required to pick up his individual assignment for each upcoming week from the Traffic Checking Office's Communication Desk between every Wednesday, 3:00 P.M. and Friday, 5:00 P.M. The assignment packages were handed out by either a Superintendent or Assistant Field Manager at the Communication Desk, and upon reviewing the assignments in their presence, the employees signed and returned the attached "Work Receipt" to acknowledge their receipt and acceptance of the assignment. While the Work Receipt listed only the dates on which the employee was scheduled to work, the assignment sheets, which were retained by the employee, included all pertinent information regarding the scheduled date, time, and location of the assignments. The assignments varied on a day-to-day basis, but generally, traffic checkers were assigned to a MaBSTOA bus, bus stop, or bus depot where they would record the arrival or departure times of buses and/or the number of passengers aboard or boarding the buses at a designated post.

On August 6, 2008, plaintiff picked up his first individual assignment packet and signed and returned the attached Work Receipt. The Work Receipt indicated that plaintiff was scheduled to

---

[3] The exhibit submitted by defendant bears both plaintiff and Ms. Goodman's signatures, which normally indicates that the employee has been counseled regarding the disciplinary violation, but the document also contains Mr. Miller's notation that plaintiff was not counseled regarding this instance. However, plaintiff did not dispute that he had met with the MabSTOA traffic checking operation management a total of four times to discuss his lateness and that he had been represented by a union representative at each of those meetings.

work five days during the following week, beginning on Sunday, August 10, 2008. Specifically, on that date, plaintiff was scheduled to report first to the Traffic Checking Office by 6:30 A.M. to punch in for work and then proceed to his "paratransit" assignment at the intersection of Hamilton Avenue and Columbia Street in Brooklyn where he was to arrive by 7:18 A.M. to begin recording the first bus at 7:30 A.M. Pursuant to the Division of Security's Standard Operating Procedure effective at the time, employees entering and leaving the Traffic Checking Office between the hours of 7:00 P.M. and 6:00 A.M. on weekdays and at all hours on the weekend were required to provide photo identification and to sign in and out of a Registry Logbook. The Registry Logbook entries for August 10, 2008 indicated that plaintiff did not sign in until 7:15 A.M., and plaintiff's timecard showed that he did not clock in for work until 7:18 A.M. The Registry Logbook also indicated that plaintiff signed out of the building at 7:30 A.M., presumably to leave for his post, and his work assignment sheet showed that plaintiff did not record his first entry until 8:31 A.M. The supervisor on duty accordingly cited plaintiff for being 48 minutes late to his scheduled tour of duty and noted that plaintiff gave no reason for his lateness. Defendant initiated disciplinary action but no hearing regarding this instance followed. Although the Discrepancy Notification noted that plaintiff had not been notified, it did indicate that plaintiff had been counseled and that the lateness was not excused by management and that no acceptable documentation had been provided.

On August 22, 2003, plaintiff picked up his second individual assignment and signed and returned the attached Work Receipt, which indicated that he was scheduled to work on Thursday, August 28th and Saturday, August 30th during the coming week. On August 28, 2003, plaintiff was scheduled to report for a "ridecheck" assignment at the Queens Village depot by 5:45 A.M., but he did not come into work that day. At his deposition, plaintiff testified that he had gone to the Manhattan Eye, Ear, and Throat Hospital ("MEETH") to receive an eye examination in connection

with a pending job application with the Transportation Security Administration ("TSA").[4] *See* Stone Dep. I at 135-37. Plaintiff further testified that the doctors informed him at the conclusion of the examination that he had cataracts and that, as a result, he would be blind within a year. *See id.* at 79. Because plaintiff did not call in to the Communication Desk regarding his absence, the supervisor on duty cited plaintiff for failing to show up for his assignment. Another disciplinary action was initiated against plaintiff, but the Discrepancy Notification indicated that plaintiff had not been notified regarding the AWOL, and neither plaintiff nor Mr. Miller signed the form.

Following his AWOL on August 28, 2003, defendant stopped issuing work assignments to plaintiff. On August 29, 2003, Mr. Miller sent plaintiff a memo in which he briefly listed the five disciplinary violations against plaintiff and stated that "[i]n the near future the division shall meet with you to discuss the open violations." Dfs. Exh. Y. And, on September 4, 2003, Mr. Miller met with plaintiff and two union representatives to discuss the aforementioned disciplinary violations. Plaintiff testified during his deposition that he offered Mr. Miller copies of certain medical records, including his MEETH evaluation, to show where he had been on August 28, 2003, but Mr. Miller refused to review the documents. *See* Stone Dep. I at 157-61. Plaintiff further testified that "once the issue of not being able to see was broached", Mr. Miller "left the room in a huff" and stated his intent to dismiss him when he returned. *Id.* at 166-67. At some point during the meeting, Mr. Miller also stated that plaintiff would be unable to see the buses or trains because of his condition. Mr. Miller ultimately offered plaintiff the option of resigning in lieu of being dismissed in accordance with MaBSTOA's practice of dealing with probationary employees who have incurred three or more

---

[4] On August 27, 2003, plaintiff went to the TSA to apply for a job as a lead transportation screener, but learned that he had failed their distance vision standard. The TSA informed plaintiff that his application would be re-evaluated upon receipt of further information from an eye doctor within 30 days.

instances of lateness or absences. Plaintiff tendered his resignation as a part-time Traffic Checker and testified during his deposition that he did not "really fight[]" for his job and that he went into the September 4, 2008 meeting with the intention of resigning. Stone Dep. II at 130-31, 138. On his resignation form, however, plaintiff cited personal reasons for his decision. Plaintiff also testified that, according to his union representative, he had been dismissed because of his medical problems. Specifically, the representative stated to plaintiff, "Everything was going okay. [Mr. Miller] said everything was going okay with regard to the lateness, but when you mentioned this medical issue, that's when the die was cast." Stone Dep. I at 170. On the New York City Transit's final evaluation, however, the defendant documented that plaintiff resigned in lieu of dismissal and that his performance was unsatisfactory, specifically citing plaintiff's four late work violations and one AWOL during his probationary employment period.

Approximately a week and a half after receiving his original diagnosis, plaintiff learned that he had been incorrectly diagnosed with severe cataracts.[5]

## DISCUSSION

### I.    Standard of Review

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995). The moving party must demonstrate the absence of any material factual

---

[5] Plaintiff did not clearly answer defense counsel's questions about whether he had been incorrectly diagnosed with cataracts or with severe cataracts that would lead to blindness. *Compare* Stone Dep. I at 146 (stating that a doctor told plaintiff that he was not going to go blind because he did not have cataracts and that "everything was okay"), *with id.* at 171-72 (stating that he never had cataracts that would lead to blindness). For purposes of this motion, the court views all inferences from the facts in the light most favorable to the non-moving party, and therefore assumes that plaintiff still suffers from some form of cataracts.

issue genuinely in dispute. *Id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where the nonmoving party has chosen not to respond to a motion for summary judgment, the court must still examine the moving party's submission to determine if it has met its burden of demonstrating that there is no material issue of fact and whether it is entitled to judgment as a matter of law. *CSC Holdings, Inc. v. Kelly*, 374 F.Supp.2d 303, 305 (E.D.N.Y. 2005). In determining whether the moving party in an unopposed motion for summary judgment has met its burden, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement; rather, it must be satisfied that the citation to evidence in the record supports the assertions. *Id.*

District courts must be cautious when granting summary judgment in employment discrimination cases because the employer's intent is often at issue. *See Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir. 1994). Because a victim of discrimination is "seldom able to prove his . . . claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence", where there are issues going to "a defendant's state intent and state of mind . . . , summary judgment is ordinarily inappropriate." *Rosendale v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). However, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Summary judgment is therefore still appropriate "even in the fact-intensive context of discrimination cases" where the standards of Rule 56 have been met. *Abdu Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## II. ADA

In disability discrimination cases, courts apply the three-step burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  The plaintiff must first establish a prima facie case.  *Id.*  The burden of production then shifts to the defendant to articulate a legitimate non-discriminatory reason for its actions.  *Id.*  To prevail, the plaintiff must demonstrate that the proffered reason is a pretext for intentional discrimination.  *Id.*  The burden of persuasion remains at all times on the plaintiff, and, at the summary judgment stage, this means that the plaintiff "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision."  *Gallo*, 22 F.3d at 1225.

## A.     "Disability"

To establish a prima facie case of disability discrimination, a plaintiff must show that (1) his employer is subject to the ADA; (2) he suffers a disability within the meaning of the ADA; (3) he is otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001).  Defendant argues that plaintiff's claims fail because he cannot establish that he suffers a "disability" as provided under the ADA.[6]

The ADA defines "disability" as either: "(A) a physical or mental impairment that substantially limits one or more of an individual's major life activities[7]; (B) a record of such

---

[6]   In defendant's brief, defendant also mentions that plaintiff cannot establish that he suffered an adverse employment action because of his disability but then does not provide any arguments as to this factor.

[7]   Major life activities include "walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(I).

impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102(2); *Sutton v. United Air Lines*, 527 U.S. 471, 478 (1999). Not all physical or mental impairments are considered a "disability" cognizable under the ADA. *See Toyota Motor v. Williams*, 534 U.S. 184, 197 (2002) (stating that Congress intended to "create a demanding standard for qualifying as disabled" under the ADA). A limitation is substantial if a person is "significantly restricted as to the condition, manner, or duration under which [he] can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity." *Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 150 (2d Cir. 1998) (internal quotation marks omitted) (citing 29 C.F.R. § 1630.2(j)(1)(I)). The ADA requires "that the impairment . . . be significant and not merely trivial", *id.* 140 F.3d at 151 (internal quotation marks and citations omitted), and courts consider the nature and severity of the impairment, the impairment's duration, and the permanent or long-term impact resulting from the impairment, *see* 29 C.F.R. § 1630.2(j)(2). "Whether a person has a disability under the ADA is an individualized", fact-specific inquiry. *Sutton*, 527 U.S. at 483.

Defendant argues that plaintiff is unable to demonstrate that he is disabled under subsection (A) of the ADA because, by his own admission, he was incorrectly diagnosed with cataracts. The record, however, is unclear as to whether plaintiff did not suffer from cataracts at all, or whether he simply does not have severe cataracts leading to blindness.[8] Yet even providing plaintiff the favorable inference that he still suffers from some form of cataracts, plaintiff's present impairment, if any, does not qualify as a "disability" under the ADA. There is no indication in the record that plaintiff's cataracts substantially limit him in any major life activity or that he himself considers his

---

[8] *See supra* n.5.

impairment as significant.  Plaintiff testified that, after his dismissal from the MaBSTOA, he was able to "actively" seek employment for a variety of positions, including compensation investigator for the State of New York, parole officer for the New York State Department of Parole, and a job with the New York State Police.  *See* Stone Dep. I at 57.  Plaintiff also testified that, while he did not ultimately receive an offer from the TSA due to issues with his credit, he has since satisfied the vision standards for the airport screener position.  *See id.* at 139-40.  There is no other evidence in the record that even suggests that plaintiff's impairment is anything but "trivial" under the ADA.  *See Reeves*, 140 F.3d at 151.

Because plaintiff is not "disabled" under subsection (A) of the ADA and there is no issue of whether plaintiff had a record of his disability under subsection (B), the court must consider whether plaintiff was "regarded" as disabled under subsection (C).  Under 42 U.S.C. § 12102(2)(C), the "decisive issue is the employer's perception of his or her employee's alleged impairment" and is therefore "a question of intent."  *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997).  The employee must not only show that his employer "regarded him as somehow disabled, but that [they] regarded him as disabled within the meaning of the ADA."  *Giordano*, 274 F.3d at 748 (alternations and internal quotations omitted).  Specifically, an employee can be regarded as disabled under the statute if: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  *Sutton*, 527 U.S. at 489.  Because plaintiff mistakenly believed and then informed defendant that he was diagnosed with severe cataracts, his claim falls within the first category.  Although the argument is not advanced by plaintiff, the court will consider whether defendant perceived plaintiff as being substantially limited in the major life activities of working and/or seeing because of his cataracts.

For plaintiff to demonstrate that he is "substantially limited" in the major life activity of working, he must show that "his impairment disqualifies him from either a particular class of jobs or a broad range of jobs in various classes, as compared to a non-impaired person of similar training, skill, and experience." *Giordano*, 274 F.3d at 750 (citing 29 C.F.R. § 1630.2(j)(3)(I)). Here, the evidence demonstrates that, at most, the defendant regarded the plaintiff as unable to perform the duties of a traffic checker, not a broad class of jobs. Plaintiff alleged in his complaint that Mr. Miller stated "that the Plaintiff's condition could affect his ability to see the buses and trains," the very responsibilities of a traffic checker. Compl. at 4. Similarly, in his EEOC Charge of Discrimination, plaintiff stated that "[w]hen Mr. Miller found out about the eye problem he stated, 'Well this would cause a problem for me when I would have to view buses and trains (traffic checking).'" Dfs. Exh. G. Plaintiff confirmed in his deposition that Mr. Miller believed he could not perform the duties of a traffic checker because of his cataracts. *See* Stone Dep. I at 170-71.[9] The statements offered by the plaintiff indicate that Mr. Miller was specifically concerned about plaintiff's ability to carry out the duties of a traffic checker. They are insufficient to permit the inference that the defendant perceived plaintiff as having a physical impairment that substantially limited his ability to work, and it is not enough under the ADA that the plaintiff may have been regarded as unable "to perform a single, particular job." *Sutton*, 527 U.S. at 491; *see, e.g.*, *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, at 646-47 (2d Cir. 1998); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 872-73 (2d Cir. 1998).

_____

[9] During the deposition, counsel for defendant specifically questioned plaintiff about Mr. Miller's comment during the September 4, 2003 meeting, as alleged in the Complaint. Counsel asked, "Is it safe to say that you interpreted this statement to me[an] that because you have cataracts you weren't capable to perform the duties of a traffic checker?" Plaintiff replied, "I didn't—there was no interpretation on my part. He said you can't do that job." Stone Dep. I at 170-71.

Although defendant did not regard plaintiff as being substantially limited in his ability to work, the court finds, after viewing all inferences from the facts in the light most favorable to plaintiff, that he could have been so regarded as to his ability to see. If plaintiff informed Mr. Miller that he had been diagnosed with a form of cataracts that would cause blindness within a year, then a reasonable jury could conclude that Mr. Miller regarded plaintiff as having a physical impairment that not only limits but entirely prevents plaintiff from seeing.

Because defendant does not dispute the remaining elements of plaintiff's prima facie case and plaintiff has met the minimal standard required to make his prima facie case by demonstrating that he was regarded as disabled under the ADA, the court considers whether plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by a discriminatory reason. *See Stratton v. Dept. for the Aging*, 132 F.3d 869, 878 (2d Cir. 1997).

**B.    Legitimate, Non-discriminatory Motive**

Defendant acknowledges that, if the court finds that the plaintiff is disabled under the ADA based at least in part on Mr. Miller's statements about plaintiff's ability to see, the proper framework is the "mixed-motive" analysis. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-83 (2d Cir. 1992) (holding that a mixed-motive analysis applies if plaintiff demonstrates that "an impermissible criterion in fact entered into the employment decision"). To establish "mixed motive", plaintiff must "focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." *Id.* If plaintiff is able to meet this burden, which is greater than the level of proof necessary to make out a *McDonnell-Douglas* prima facie case, "the burden of *proof*, and not merely the burden of *production*, passes to the defendant." *Stratton*, 132 F.3d at 878 & n.4. The defendant can "escape liability only by showing by a preponderance of the evidence, that even without the presence of the

14

illegitimate factor, the decision would have been the same." *Id.* Here, even if plaintiff can meet this burden, defendant has established its affirmative defense.

Plaintiff testified that he was dismissed because of his disability and, as evidence, points to Mr. Miller's comment on his inability to see the buses or trains. Defendant argues, however, that plaintiff was discharged because he incurred multiple disciplinary violations during his period of probationary employment and offers evidence sufficient for the trier of fact to conclude that plaintiff was indeed fired for the reason proffered. The record demonstrates that, despite MaBSTOA's established rules and procedures requiring all probationary employees to report for duty on time and provide notice in case of absence, plaintiff failed to do so on five separate occasions in less than two months of employment. Plaintiff himself does not dispute that he incurred the cited disciplinary violations or that he was counseled on at least three instances regarding his tardiness, but attempts only to argue that defendant's policies regarding employee tardiness are unsound. Defendant also offers evidence demonstrating that MaBSTOA took immediate actions evincing its intent to dismiss plaintiff after his AWOL on August 28, 2003. By the next day, defendant stopped issuing work assignments to plaintiff and sent a memo indicating its intent to meet with plaintiff "in the near future" to discuss all of his violations. Within approximately one week, defendant met with plaintiff and, pursuant to MaBSTOA's standard practice in cases where a probationary employee incurs three or more disciplinary violations, offered him the option of resigning in lieu of dismissal. The evidence clearly demonstrates that, even if plaintiff had not informed Mr. Miller regarding his diagnosis, defendant would have nonetheless dismissed plaintiff for incurring multiple disciplinary violations during his period of probationary employment. Thus, given the undisputed evidence, defendant has met its burden under the mixed motive analysis, and no reasonable jury could conclude otherwise.

## CONCLUSION

Based upon all the facts, the court finds that, even if plaintiff can establish a prima facie case of discrimination, the undisputed proof is that defendant would have dismissed plaintiff regardless of his impairment for an independent, nondiscriminatory reason. For the reasons discussed above, defendant's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment for defendant.

**SO ORDERED.**

_____/s_____

**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
       March 26, 2008